207 So.2d 546 (1967)
SOUTHWEST LOUISIANA ELECTRIC MEMBERSHIP CORPORATION, Plaintiff-Appellant,
v.
Ursule Abshire SIMON et al., Defendants-Appellees.
No. 2134.
Court of Appeal of Louisiana, Third Circuit.
October 27, 1967.
Rehearing Denied December 12, 1967.
On Rehearing February 28, 1968.
Writ Refused April 19, 1968.
*548 Davidson, Meaux, Onebane & Donohoe, by Edward Abell, Jr., Lafayette, for plaintiff-appellant.
Kibbe, Edwards, Cooper & Sonnier, by Silas B. Cooper, Abbeville, for defendants-appellees.
Before FRUGE, SAVOY and LEAR, JJ.
LEAR, Judge.
In 1966, plaintiff, a Louisiana corporation domiciled in the Parish of Lafayette, desired to construct a high-powered transmission line 30 miles long, to be known as the Lyons Point-Kaplan-Esther Transmission Line. In order to do this it was necessary that said corporation acquire servitudes, or rights-of-way, across private property for the construction of the necessary towers and for ingress and egress to those poles and the lines carried thereon for the purposes of replacement, maintenance, etc. The needful servitude was to be 50 feet in width, together with the right to cut and remove from the land adjacent to said servitude any and all trees which in falling would come within 10 feet of the proposed transmission line. It was agreed that payment of the reasonable market value would be made for any such tree or trees felled.
During its 30-mile course across the properties of many landowners, it was proposed to run this line across three tracts of land owned by the two defendants.
Mrs. Ursule Abshire Simon owned one tract containing 75.82 acres and another tract containing 47½ acres, both being situated in the Parish of Vermilion. Mr. Starling Simon owned a tract, also in the Parish of Vermilion, containing 57½ acres.
*549 Obviously being unable to acquire these servitudes by convention, petitioner has now provoked these expropriation suits. Except for the allegations peculiar to the individual defendants, the petitions for expropriation are identical and, the issues being the same, the cases were consolidated for trial in the Fifteenth Judicial District Court, Parish of Vermilion. For the present purposes of the court, the two suits shall be considered as one.
The petition alleges that petitioner is a public utility corporation organized for the purpose of generating, transmitting and distributing electric energy for power, light, heat and other uses in several parishes in the State of Louisiana, including the Parish of Vermilion. It is alleged that the construction and erection of additional transmission facilities are necessary in order to adequately serve petitioner's service area and particularly their present customers with an adequate supply of electric energy.
The petition further alleges that the route of said transmission line or lines has been determined upon, surveyed and located and that such servitude must cross the three tracts of land owned by the two defendants herein. It goes on to say that petitioner needs for such "public service" the proposed 50-foot right-of-way together with certain other considerations such as the right to remove the trees mentioned above and the right to place anchors and guy wires in certain necessary locations.
Plaintiff states that there are no improvements on the proposed servitude and that the construction, operation and maintenance of the transmission line will be conducted according to proper standards and will not be dangerous to persons or property and will not interfere with the landowner's use of the property except that the landowner may not be allowed to erect any structure on the right-of-way or make any other use of the property subject to the servitude which would interfere with petitioner's use and enjoyment thereof.
Petitioner offered to pay Mrs. Ursule Abshire Simon the sum of $1,142.60 for the servitude across the 75.82-acre tract of land and $546.08 for the servitude across the 47½ acre tract of land. It offered to pay Mr. Starling Simon the sum of $1,541.20 for the servitude across his property.
By supplemental petition, petitioner further alleges that "* * * defendant will suffer no special damages, loss of title to real estate or severance damages as a result of the servitude".
In the suit involving defendant Starling Simon, the petition was first met with a declinatory exception attacking the sufficiency of service. The record does not make it clear as to what disposition was made of this exception, but since attorneys for defendant have not raised the issue before this court, it must be considered that the defect, if any, was corrected or that the objection was abandoned.
Next was filed a dilatory exception, bearing on both cases, in which the defendants contend that the demand of the plaintiff was premature, in that plaintiff had failed to conduct bona fide negotiations as to the location of the right-of-way sought, had arbitrarily refused to give any consideration whatsoever to the convenience of the defendants, and had not made a tender of the true value of the land or a tender of the amount of severance damage to be suffered by the adjoining property belonging to the defendants. The exception further alleged that the petition was vague and indefinite in various respects.
This was followed by a peremptory exception in which defendants state that petitioner had no right of expropriation, no certificate of public convenience and necessity, that the purported expropriation was contrary to the Constitution of the State of Louisiana, and that petitioner is not a public utility and hence devoid of the right of eminent domain.
All exceptions were overruled by the trial court, but the issues raised thereby *550 are reurged here. The peremptory exception mentioned above was actually filed after the answer filed in the suit, but that does not destroy the continuity of the presentation of the issues to the court for the reason that the issues raised by the peremptory exception were actually raised in the answer itself.
The answer to the petition is, in essence, a general denial, but contains certain affirmative statements on the part of the defendants in contradiction of the plaintiff's side of the story. Defendants affirmatively state that they offered plaintiff a right-of-way across their lands provided that plaintiff would accept a servitude alongside a public road, rather than insist upon a servitude which would bisect defendants' properties. Defendants set forth that these properties are highly valuable rice fields and that a dichotomy thereof would be inconvenient, dangerous and financially damaging to the defendants. The answer urges as special defenses the unconstitutionality of the plaintiff's attempt to expropriate and that an alternate and more direct route from the point of origin to the point of conclusion of the proposed high line was available to the petitioner for the transmission facility in question. In the alternative, the answer alleges that the proposed line was to be built solely for financial profit and primarily to serve industrial users in the intracoastal city area of Vermilion Parish which was contrary to the expressed purposes of the charter of the plaintiff corporation. Further in the alternative, the answer alleges that if the court finds that plaintiff is entitled to expropriate then certain restrictions should be imposed upon plaintiff and its use of the servitude.
Further in the alternative, the answer states that plaintiff is abusing its discretion and privilege, if any, of expropriation and still alleging in the alternative defendants' claim that the fair market value of the property sought to be taken is $50.00 per lineal rod and that defendants should be awarded additional severance damages.
With the issues thus joined, the matter went to trial. At the conclusion thereof the trial court, giving written reasons, concluded that petitioner corporation had the constitutional and statutory right to expropriate defendants' properties without the need of a certificate of public convenience and necessity. The court then held that the proposed route across these lands was reasonable and within the right of the condemnor to select.
Having allowed the expropriation to proceed along the servitude line as selected by petitioner, the court then considered the question of the value of the parts taken. As the court stated, there was virtually no contest as to the actual market value of the property over which the servitude would pass. Thereupon, the court awarded Mrs. Ursule Abshire Simon the sum of $1,154.10 for the servitude over the 75.82-acre tract and the sum of $628.85 for the servitude over the 47½-acre tract. It awarded Mr. Starling Simon judgment in the sum of $1,900.00 for the servitude over the 57½-acre tract.
The final question to be decided by the court was that of severance damages. The defendants contended that they planted, fertilized and spread herbicide from crop-dusting airplanes. They showed that the existence of these electric transmission lines bisecting these fields impaired and hampered the normal operation of the airplanes and thereby put them to greater expense each year for these necessary operations.
The defendants further stated that it would be necessary to re-level the entire field because of the position of the poles and the dirt mounds resulting therefrom.
The court agreed that these items of damage should be considered severance damages and compensated for by plaintiff. Thereupon, the court awarded Mrs. Ursule Abshire Simon the sum of $2,441.40 for severance damages on the 75.82-acre tract and the sum of $1,529.40 for severance damages on the 47½-acre tract. It awarded *551 Mr. Starling Simon the sum of $1,851.40 as severance damages on the 57½-acre tract belonging to him.
The court stated that the cost of releveling the fields, if shown to be necessary, would be an item of compensable damage. However, since the poles had not yet been erected and the situs was in a speculative condition, the court reserved to the defendant landowners the right to claim damages for land leveling should the necessity arise.
In addition to the awards given above, the judgment recognized a bill from Mr. George C. Hengy, a consulting engineer used as an expert witness by the defendant landowners. Mr. Hengy had submitted a bill in the sum of $337.80 for work done by him in preparation for his testimony in court and an additional fee of $100.00 for his testifying by way of deposition in the case. Other experts were used on the trial of the matter and each of them was accorded a fee of $100.00 per day. All of these fees were assessed as costs.
Judgment to the effect as stated above was signed.
After the entry of judgment herein, Southwest Louisiana Electric Membership Corporation perfected a devolutive appeal to this court asking that the judgment of the district court be reversed insofar as it awards any severance damages to the landowners and asking that the judgment be amended to reduce the expert fees awarded to Mr. George Hengy from $437.80 to the sum of $237.80. In their petition for appeal the petitioner stated that in all other respects the judgment of the Fifteenth Judicial District Court should be affirmed.
Defendants answered the appeal re-urging the want of the power to expropriate in petitioner, and in the alternative urging that petitioner had abused its discretion and power by refusing to relocate the servitude in accordance with the desires of the landowners, and in the second alternative asking that the amount awarded as severance damages be increased.
The question first presenting itself to this court is, of course, whether the plaintiff has the right to expropriate private property.
The Constitution of the State of Louisiana, Article I, Section 2, states:
"Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
Section 15 of Article IV of that same document provides:
"[N]or shall vested rights be divested, unless for purposes of public utility, and for just and adequate compensation previously paid."
At the outset it should be noted that the taking of the property shall be for "public purposes" or for "public utility". The constitutional requirement does not limit the authority to expropriate to a "public utility" as that term is ordinarily used and understood. The right to expropriate is dependent not upon the public character and nature of the corporation per se, but upon the public purposes and public interests which are served by that corporation and to which the expropriation has a direct relationship. See Central Louisiana Electric Co. v. Pugh, La.App. 2 Cir., 1957, 96 So.2d 523; Texas Eastern Transmission Corp. v. Terzia, La. App. 2 Cir., 1962, 138 So.2d 874.
The district court held that the use of the words "other public utilities" in Paragraph (11) of L.R.S. 12:303 (Electric Cooperative Law) "indicates the intent of the Legislature in classing these electric cooperatives as public utilities * * *".
To agree with this conclusion would be to bring disaster down upon the heads of every R.E.A. Cooperative in the state.
Article VI, Section 3 of the Louisiana Constitution of 1921 established the Louisiana Public Service Commission Section 4 sets forth its powers. Among those was the *552 authority to: "* * * have and exercise all necessary power and authority to supervise, govern, regulate and control all * * * public utilities in the State of Louisiana". If South Louisiana Electric Membership Corporation is a public utility, then the provision of L.R.S. 12:326 exempting electric cooperatives from the jurisdiction and control of the Louisiana Public Service Commission would be patently unconstitutional and the cooperative would be required to proceed under a certificate of convenience and necessity which it does not have.
Therefore, we must proceed to the question of whether the proposed expropriation was undertaken in the public interest and for purposes of public utility.
L.R.S. 12:303(12) expressly grants electric cooperatives the right to exercise the power of eminent domain. Defendants strongly urge that since electric cooperatives in Louisiana do not serve the public or public purposes, such grant of authority is contrary to the constitutional provisions mentioned above. It is true that electric cooperatives are organized and exist mainly to serve their members only. The statutory law and the bylaws of the plaintiff corporation both announce this primary purpose. Non-members may be served by the corporate facilities if the number of non-member consumers does not exceed ten percent of the membership of the cooperative. This percentage is increased to forty percent in the event the cooperative acquires an existing electric facility dedicated to the public use. However, in addition to these consumers, Sub-section (4) of L.R.S. 12:303 provides that a cooperative may sell to governmental agencies and political subdivisions. Whether or not we agree with the political philosophy which allows the establishment and maintenance of this type of facility, they obviously have become a part of our way of life and undoubtedly do serve a very important function in areas in which investor-owned companies have either been unable or unwilling to function. In view of the provision that they are authorized to furnish governmental agencies and political subdivisions with needed electrical energy, it is the conclusion of the court that they do serve a public purpose within the meaning of the Constitution to such an extent that the legislative grant of the right to expropriate is not contrary to the cited provisions of the Louisiana State Constitution of 1921.
This is in accord with the finding of the district court, and this court feels that its reasoning and conclusion are correct in the premises. See Goins et al. v. Beauregard Electric Cooperatives, Inc., La.App. 1 Cir., 44 So.2d 715. See also Central Louisiana Electric Co. v. Pugh, La.App. 1 Cir., 96 So. 2d 523.
We next pass to the proposition offered by defendants to the effect that there is an alternate route across their properties immediately adjacent to and alongside a public road which is better suited for the location of a high-powered transmission line and which would be made readily available by them to the petitioner herein.
The Supreme Court in Greater Baton Rouge Port Commission v. Watson et al, 224 La. 136, 68 So.2d 901, citing City of Westwego v. Marrero Land and Improvement Ass'n, 221 La. 564, 59 So.2d 885, announced that the expediency of expropriation is a matter for judicial determination, but that the suitability of the property sought to be taken is primarily within the sound discretion of the body possessing the power of eminent domain. In Louisiana Power & Light Co. v. Anderson, La.App. 2 Cir., 188 So.2d 733, we find the principle announced that the condemnor's selection of location will not be disturbed unless such condemnor has abused its discretion, acted in bad faith, or acted arbitrarily or unreasonably.
Generally speaking, it can hardly be disputed that a corporation such as plaintiff, by virtue of its experience in the field and the availability to it of expert advice, is the best judge of the route that should *553 be taken by its transmission lines. Again generally speaking, the law says that if it acts within the scope and area of sound economic principles and proper engineering procedures, its selection of the land will not be disturbed.
However, as opposed to the universal application of these principles, it should be noted that a condemnor is absolutely required to conduct bona fide negotiations with the landowner before exercising its right of condemnation. See Calcasieu & Southern Railway Co. v. Witte, 224 La. 1091, 71 So.2d 854. Furthermore, the statutory law (L.R.S. 19:2) specifically provides that in the case of the transmission of electricity:
"The buildings, transmission lines, stations and sub-stations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of wires of other wire-using companies or, more than is necessary, with the convenience of the land-owner." (Emphasis supplied.)
The necessity for expropriation for public purposes or in the public interest relegates the landowner's right to all of the aspects of his ownership to a secondary position. But we think it clear that the statute requires the court to consider the landowner's safety and convenience as the primary consideration and the selection of location by the condemnor to be the secondary consideration.
All three tracts of land involved in this litigation are used for rice farming. In seeding, fertilizing and spreading herbicides and insecticides, airplanes are used. The evidence leaves little doubt that the existence of these transmission lines across the middle of these rice fields not only is dangerous to the aircraft and its pilot, but also makes the growing of rice a more expensive operation than if the poles and wires were not there. The inherent danger in a high-powered transmission line to persons working around and under them is so obvious as not to require comment.
The testimony of Mr. Hetherwick, Chief Engineer for plaintiff corporation, shows that this particular transmission line was routed and projected on a map before any attempt was made to determine the feasibility of its route by personal examination of the ground over which it would pass or before any attempt was made to either option or purchase the rights-of-way which were obviously going to be necessary for the establishment of this line.
Though there was some correspondence between the plaintiff and the landowners' representatives relative to the establishment of this servitude, at no time did the company enter into serious, bona fide negotiations with the landowners as to the rerouting of the projected route. This, despite the fact that the landowners notified the company on at least two occasions, and in no uncertain terms, that they were more than willing to grant them a servitude if the servitude would be established on their property adjacent to the public road mentioned above. Proof that the original projection was not an inflexible thing is shown by Mr. Hetherwick's admission that when they approached a Mr. Wilmer Dartez for a right-of-way across his property, he became "very unhappy about the whole thing" and ordered the engineers off his property, refusing them the right even to make a survey. When confronted with this attitude on the part of Mr. Dartez, the company moved the line so that it would not infringe upon his property in any degree. By this action the company was certainly considering the convenience of Mr. Dartez, but the record does not reflect that they ever considered the convenience of the defendants herein.
Mr. Hetherwick determined the ground location of this projected transmission line and then made his recommendations to the Board of Directors. Several members of the Board of Directors for plaintiff corporation *554 testified and stated, in effect, that in deference to Mr. Hetherwick's technical training and great experience they accepted his recommendation and approved the route proposed by him. A further reading of Mr. Hetherwick's testimony convinces the court that the primary consideration given by Mr. Hetherwick to this proposed route was that of cost. However, it is clear that to angle this line to remove it from the middle of these fields and to run it adjacent to the public roadway, would mean very little additional cost to the plaintiff corporation. In fact, it might be that moving the line route prior to construction would ultimately result in substantial savings to the plaintiff corporation. As pointed out by Mr. Hengy, a witness for defendants, service to and maintenance of that line would be much easier and much cheaper if it were next to the roadway than if trouble developed in the middle of a rice field at a time when the field was flooded. If some repair work were necessary during the time when these fields were flooded, it would be almost impossible to take heavy equipment to the point of trouble without either doing a tremendous amount of damage to the rice in the field, or without having to build some sort of plank road to enable the equipment to traverse the muddy field. On the other hand, with the heavy equipment and bucket trucks that are available to petitioner, maintenance of or repair to the completed line would be relatively easy from the roadway.
Furthermore, in considering the equities between the parties it is established that although a moving of the line would be a little more expensive to the company, the sowing, raising and harvesting of the rice is going to be more expensive to the landowner, and this is going to be a continuing expense that will exist as long as the poles and wires stand in the middle of their fields.
As stated above, there has never been any serious dispute as to the price the company was willing to pay and the price the defendants were willing to accept as to the land contained within the servitude itself. In fact, this is not an issue before this court. Plaintiff appealed only from that portion of the decision of the trial court awarding severance damages and setting Mr. Hengy's expert witness fee at $437.80. The appeal did not complain of the compensation award for the land actually taken. In answering the appeal, defendants complained of the trial court's grant to petitioner of the power of expropriation and, in the alternative, complained of the location of the line and in the second alternative alleged insufficient severance damages.
Despite the apparent accord that has always existed as to the value of the expropriated property, nowhere in this voluminous record do we find that the petitioner made any attempt to reasonably negotiate the relocation of the line with the landowners. This breach of its duty to negotiate in a bona fide manner is contrary to the rule announced in the Calcasieu & Southern Railway Company case, supra, and further indicates a complete disregard of the landowners' convenience as required by L.R.S. 19:2.
In dealing with this problem, the trial court had this to say:
"On the question of the location of the proposed line, the Court finds that in locating this line, the plaintiff corporation did not abuse its discretion and did not interfere more than was necessary with the convenience of the landowner. Obviously, in this case, there could have been any number of alternate locations for the line in question, and certainly the line in question could be constructed along the road as was indicated by landowner's expert (by way of deposition) Mr. Hengy. (Emphasis ours.) In determining which location is best, the Courts must consider all aspects. The testimony shows that SLEMCO negotiated with landowners in these cases and many suggestions were considered. Actually it is this Court's impression, from its experience in hearing expropriation cases, that the plaintiff co-op probably *555 gave more time and thought and consideration to the landowners than is usually done in expropriations of this kind. In seeking to locate a line of this nature, what may be best for one landowner is disadvantageous for the next landowner, et cetera. There is actually no perfect solution to the problem. Any location finally decided on is not usually acceptable to all parties. In the location of rights-of-way, considerable discretion is vested in the expropriating authority, and the Courts will not disturb or interfere with the exercise thereof in the absence of fraud, bad faith, or conduct or practices amounting to an abuse of the privilege. It is well settled that availability of other and alternate routes is of no concern to the property owner whose land is sought to be expropriated, provided the location selected fulfills the needs and requirements of the Condemnor, meets the standard prescribed by sound engineering and economic practices, is neither arbitrarily nor capriciously chosen and does not constitute abuse of a discretionary right of selection. ([Central La. El. Co.] v. Covington [& St. Tammany L. & I. Co.] [La.App.,] 131 So.2d 369; Texas Gas & Transmission Corp. v. Pierce, [La.App,] 192 So.2d 561.) A review of all the evidence in this case satisfies this Court that plaintiff corporation was reasonable in its actions and from standpoints of engineering, safety, economics, and general convenience of the landowners over the whole route, has justified its position."
Ordinarily, this court would be most reluctant to dispute or disagree with such positive statements of facts and conclusions by our capable brother on the district bench. However, due to the nature of this litigation and the fact that this decision will affect the relationship of these parties for many, many years to come, this court feels that a review of all of the evidence should be had.
After Mr. Hetherwick had projected the proposed route of this line on his maps, it then became the duty of Mr. John S. Labbe to obtain the right-of-way from the various landowners affected. He, being the right-of-way agent for petitioner, undertook to purchase the necessary servitudes and one of the first landowners that he contacted was Mr. Wilmer Dartez, mentioned above. He admitted that Mr. Dartez absolutely refused to entertain the idea of a transmission line through his property and at one time threatened to bodily eject petitioner's engineers, who evidently were attempting to conduct a survey. In view of this attitude on the part of Mr. Dartez, Mr. Labbe admits that the transmission route was relocated on the tract immediately east of Mr. Dartez's property. It is obvious from the testimony that he personally contacted the defendants herein and explained to them petitioner's desire to purchase rights-of-way across their various rice fields and showed them generally the location of the poles and guy wires necessary to support this transmission line. These negotiations resulted in a letter of July 18, 1966, by Mr. Cooper, attorney for defendants, to the petitioner asking for a map showing the location of the poles and guy wires on the Simon property. This letter was responded to by Mr. Hetherwick in a letter addressed directly to Mrs. Simon, enclosing a check for $1,688.68 and requesting her signature upon a servitude agreement.
On October 14, 1966, Mr. Cooper again wrote Mr. Hetherwick stating that Mr. Labbe had said that petitioner had to have the line through the middle of the Simon fields. He disagreed with this conclusion and told Mr. Hetherwick that the Simons were not denying petitioner a right-of-way and in fact were offering petitioner a right-of-way, but that the Simons still wanted to know the exact locations of the proposed poles and guy wires and suggesting an alternate route which would be more convenient to his clients. He informed Mr. Hetherwick that his letter to Mrs. Simon of October 6, 1966, which was considered by Mr. Cooper and the Simons to be a final offer, "* * * still shows the *556 same location that Mr. Labbe first showed us many months ago". In that letter to Mr. Hetherwick, Mr. Cooper makes this statement:
"On the Northern portion of the Simon property where the line crosses the coulee we had proposed that you make it turn to the West within this wooded area and then come South along the middle section line, and it is our understanding that most of the property owners along the road approved of this also. Mr. Labbe says this can't be done because one property owner to the West won't agree to have one guy line located on his property. We contend that it would be much better to expropriate one guy line location than to have to file expropriation suits for four or more different tracts." (Emphasis supplied by court.)
As far as the record reflects, the representation by Mr. Cooper to the effect that most of the property owners along the road approved of this relocation was never denied or traversed by either Mr. Labbe or Mr. Hetherwick.
Mr. Cooper's letter also includes the following statement:
"We are not refusing to grant you a right-of-way! We offer to grant you a right-of-way!" (Emphasis supplied by Mr. Cooper.)
The last correspondence between the parties and the last evidence of any negotiations between them is another letter from Mr. Cooper to Mr. Hetherwick dated November 7, 1966. At this time he returned petitioner's check for $1,688.68, made payable to Mrs. Ursule Abshire Simon, also enclosed the two right-of-way forms that Mr. Hetherwick had sent to Mrs. Simon with the check. In this letter he iterates the emphasized statement mentioned in reference to his letter of October 14, 1966.
Mr. Labbe's testimony in the matter, which was introduced in evidence by way of deposition initiated by defendants, had absolutely no reference to any negotiations with the defendants herein. It is perfectly obvious from the record that he did contact the defendants on at least one occasion and attempted to persuade them to sell petitioner the desired servitude, but there is absolutely nothing in the record to show that he ever considered, or mentioned to the Simons as considering, a relocation of the line. No explanation was given by petitioner of their failure to call Mr. Labbe to testify in this case, but their failure to do so certainly impresses this court with the thought that his testimony as to negotiations with Simon would not have been very impressive as to plaintiff's desire to adequately consider the landowners' convenience in this matter.
Mr. Hetherwick was examined in this area and testified generally that there was correspondence between him and Mr. Cooper, counseler for defendants, but his entire testimony fosters the inescapable conclusion that his idea of negotiation was only to prevail. He testified positively that the entire line route was laid out without giving any consideration whatsoever to the convenience of the individual landowners. He explained this by offering the obvious reason that at the time he laid the line out originally on the maps, he didn't even know who the landowners were. This observation is subject to one exception. In response to questioning by Mr. Cooper, Mr. Hetherwick stated that at one time he did agree that he would consider relocating this line so as to place it along the west line of Mr. Starling Simon's property. The degree of consideration he gave to the relocation is not made clear, but he rejected the idea primarily because of the additional work and expense such a move would entail.
The witness most helpful to plaintiff as relates to its bona fides in negotiation is, surprisingly enough, Mr. Starling Simon. He testified that representatives of petitioner talked to him many times about the purchase of a right-of-way across his property. However, the complete picture presented by his testimony as taken in connection *557 with that of Mr. Hetherwick and Mr. Labbe shows that in all negotiations, transactions and conversations, petitioner was absolutely adamant as to its selected route.
It is the firm conviction of this court that this litigation would not have arisen nor this expropriation been made necessary if the petitioner and its engineers and representatives would have made a determined, considerate and sincere effort to meet and treat with defendants and their attorney and either accede to their wishes entirely, or accede to their wishes in part, or to explain to them in detail the absolute necessity for the proposed routing and the resultant inconvenience and expense to the landowners.
For example, taking the northernmost point on that section of the line with which we are concerned (a point marked "N" on the north boundary line of one of Mrs. Simon's tracts as shown by aerial photograph in evidence), the line proceeds due south traversing Mrs. Simon's rice field and numerous others to the south of her property, including that of Mr. Starling Simon.
Defendants desired that starting at point "N" the line be run in a westerly-southwesterly direction down a coulee and then turn due south to the southern boundary line of that tract of land, which is the northern boundary line of the land belonging to Mr. Starling Simon. Then the line would proceed due south alongside the public road which is also the midsection line. This would have pleased Mr. Starling Simon and he would have had no objection to the granting of the right-of-way to petitioner. Mr. Hetherwick gave good and valid reasons for petitioner's reluctance to run this line down the coulee, and we feel that in light of his reasons petitioner should not be required to so place the line. In the first place, it would be not to the best interests of petitioner to have it there and it would not aid Mrs. Simon a great deal, because when the line turns south from the coulee it still would traverse her rice field. However, the court can see no reason why the line could not be run from point "N" diagonally across Mrs. Simon's rice field to the point where her southern boundary line is intersected by the public road in question. This would result in the condemnation of more of her property than is proposed, but it would be giving the utmost consideration to Mr. Starling Simon and, since the northern portion belonging to Mrs. Simon evidently must be traversed by this line on one route or another, we do not think that she could or would raise an objection to this rerouteing. This record, though, is devoid of testimony that petitioner ever gave serious consideration to such rerouting or valid reason why it would object to the proposed alternate.
As stated above, once the necessity for the transmission line was agreed to by the Board of Directors of petitioner, it became Mr. Hetherwick's job to project a route on the maps and then submit that projected route to the Board of Directors for its approval or rejection.
Mr. U. J. Gajan, general manager of petitioner, Mr. Samar Simon, Mr. Harold F. Young, Mr. Malchior Campbell, and Daniel Thibodaux, all members of the Board of Directors of petitioner, testified in no uncertain terms that they voted for the location of the line as proposed by Mr. Hetherwick because of their implicit faith in his experience and engineering expertise. None of them either as general manager or as the Board of Directors made any independent investigation or inquiry as to the proper locale of the proposed line. Mr. Hetherwick proposed, they adopted. As pointed out by Mr. Samar Simon in his testimony, there was no indication given to the Board of Directors of where the line would be located with relationship to any particular farm. Furthermore, after the proposed line had been surveyed on the ground and the particular farmers identified, the Board gave the location no further consideration. In other words, there were absolutely no checks and balances placed upon Mr. Hetherwick's *558 decision. No bad faith is being imputed to Mr. Hetherwick in any manner, but it is to be noted and pointed out that he and he alone dictated the route now being objected to.
It should be interpolated here that the necessity for the line was clearly established by Mr. Hetherwick and by the testimony of Professor Samuel P. Gullett, Jr., an expert consultant, and others. This court definitely concurs with the finding of the district court that the establishment of the transmission line, per se, is necessary not only to the growth and well-being of petitioner corporation, but also to the growth and development of the area it is designed to serve.
On the other hand, defendants, by the testimony of Mr. John Gordie Broussard, Mr. Wilbert Faulk, Mr. Lloyd Duhon, Mr. Nelius Byler, and others certainly established the fact that the routeing of the line across rice fields was a nuisance, and an expensive one, to the farmer. In connection with this testimony and in an attempt to show that such nuisance factor could be alleviated or abated in the instant cases, defendants took the testimony of Mr. George C. Hengy.
Mr. Hengy is a registered professional electrical engineer, operating a consulting engineering business in the City of Shreveport, Louisiana. He came before the trial court, painting an expressive picture of education, experience and ability. Prior to his testimony he had personally acquainted himself with this problem by on-the-scene observations. He was shown the aerial maps depicting the terrain and proposed routeing. Before commencing his testimony, he made it clear that in his capacity as an engineer he followed certain guidelines in working with R.E.A. Cooperatives as set forth in the Line Manual as published by the Rural Electrification Administration known as R.E.A. Bulletin No. 62-1. In following these guidelines he pointed out that consideration of the cooperative's membership was a factor as much as the economics of the line itself. His testimony first brought to light the problem of maintenance and repair of the line after it was put into operation.
Referring to the aerial maps in evidence, he pointed out that he personally would have projected the line as did Mr. Hetherwick, but further stated that he would project an alternate line which would be the route following the road previously mentioned. He stated that he would then refer both routes to the Board of Directors with a complete explanation of the comparisons in cost and construction, comparisons in cost of maintenance and repair, and a description of the effect of the lines on the farmers' or landowners' operations. The selection of the route to be followed would then become the responsibility of the Board of Directors of the Cooperative corporation.
His conclusion as to the particular line in question was that it was a feasible, logical routeing from an electrical standpoint, but that it was an inferior location from an operation and maintenance standpoint and from the standpoint of the members' damages and convenience. He pointed out that such a transmission line had to be patrolled regularly and that they had to be worked on and maintained at regular intervals. He pointed out in no uncertain terms the difference between establishing a line and planting the poles in the soft ground of an open rice field and the relatively dry ground found along the fence line. He vividly described the difference in maintaining and repairing a line situated in the middle of a flooded rice field, as opposed to the maintenance and repair of a line situated at a point that could be reached by a bucket truck and other maintenance equipment from an established roadway. He testified without equivocation that the line could be moved to the road without violating any provisions of the National Electric Code, and it could be moved to the road and still stay within the scope of good engineering practices.
*559 The court is impressed by the visual evidence offered by the aerial photos introduced. It is further impressed with the sincerity and logic of Mr. Hengy who fairly and reasonably describes the feasibility of relocating this route to accommodate the wishes of the defendants without a corresponding hardship upon the petitioner, and we therefore find that Mr. Hetherwick, whose recommendations were followed merely because they were his recommendations, has acted arbitrarily and without due regard to the convenience of the landowners in placing the route as he has done.
To recapitulate, we find that the petitioner cooperative herein is associated with the public interest to the degree that the law does give it the right of eminent domain. We find that it has established the necessity and the desirability in the public interest to construct the proposed transmission line. We find, however, that its on-site route is arbitrarily in violation of L.R.S. 19:2(9).
Therefore, the judgment of the lower court will be reversed and the case remanded for the purpose of taking additional testimony and receiving further evidence on the restricted point pertaining to the relocation of the line across the lands of defendants, coupled with whatever evidence is desired to be introduced relating to the issue of severance damages in the light of relocation.
It may be that the lower court will desire to appoint an expert of its own choosing. It may be that the parties to this litigation, or one of them, may come forward with additional and more detailed evidentiary material relating to the line's proper location, but in the absence thereof this court will order the line to be established according to the defendants' wishes as elucidated upon by the testimony of Mr. George Hengy.
Judgment reversed and remanded for further proceedings not inconsistent with the above.
Reversed and remanded.

On Rehearing.
En Banc.
LEAR, Judge.
We granted a rehearing in this case and in the companion case of Southwest Louisiana Electric Membership Corp. v. Simon, La.App., 207 So.2d 561, for the purpose of determining whether or not the condemnor's selection of location was done arbitrarily, unreasonably, or amounted to an abuse of discretion by the condemnor. All of the facts have been set forth in the original opinion, and it will not be necessary to restate the facts on rehearing.
LSA-R.S. 19:2 specifically provides that in the case of transmission of electricity:
"The buildings, transmission lines, stations, and sub-stations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of the wires or other wire-using companies or, more than is necessary, with the convenience of the land-owner." (Emphasis supplied.)
As stated in our original opinion, we think it is clear that the statute requires the condemnor to consider the landowner's safety and convenience as an important factor in the selection of location.
There are several things to be considered in the particular type of property being expropriated in these proceedings. All three tracts of land involved are used for rice farming. In seeding, fertilizing and spreading herbicides and insecticides, aircraft are used. The evidence leaves little doubt that the existence of these transmission lines across the middle of these rice *560 fields not only is dangerous to the aircraft and pilot, but also makes the growing of rice a more expensive operation for the rice farmer. There is the further consideration that these rice fields remain flooded a good part of each year, and, as pointed out by Mr. Hengy, an expert witness for defendants, service to and maintenance of the transmission line would be very difficult during the times that these fields are flooded. It would necessitate building wood plank roads across the farmers' rice fields, which would destroy levees as well as the rice crop itself.
It is further to be considered that these lines are not what are normally known as high-powered transmission lines such as you see erected on huge steel towers, and which, admittedly, are difficult to bend, but rather, are only 69,000 volt lines which are the type we more commonly see about the city.
As stated in our original opinion, Mr. George C. Hengy, a registered professional electrical engineer, testified on behalf of the defendants. He was shown aerial maps depicting the terrain and proposed routing. Before commencing his testimony, he made it clear that in his capacity as an engineer he followed certain guidelines in working with R.E.A. Cooperatives as set forth in the Line Manual as published by the Rural Electrification Administration known as R.E.A. Bulletin No. 62-1. His testimony first brought to light the problem of maintenance and repair of the line after it was put into operation.
Referring to the aerial maps in evidence, he pointed out that he personally would have projected the line as did Mr. Hetherwick, the plaintiff's engineer, but further stated that he would project an alternate line which would be the route following the road previously mentioned. He stated that he would then refer both routes to the Board of Directors with a complete explanation of the comparisons in cost and construction, comparisons in cost of maintenance and repair, and a description of the effect of the lines on the farmers' or landowners' operations. The selection of the route to be followed would then become the responsibility of the Board of Directors of the Cooperative corporation.
His conclusion as to the particular line in question was that it was a feasible, logical routing from an electrical standpoint, but that it was an inferior location from an operation and maintenance standpoint and from the standpoint of the landowner's damages and convenience. He pointed out that such a transmission line had to be patrolled regularly, and that they had to be worked on and maintained at regular intervals. He pointed out the difference between establishing a line and planting the poles in the soft ground of an open rice field and the relatively dry ground found along the fence line or road line. He vividly described the difference in maintaining and repairing a line situated in the middle of a flooded rice field, as opposed to the maintenance and repair of a line situated at a point that could be reached by a bucket truck and other maintenance equipment from an established roadway. He testified without equivocation that the line could be moved to the road without violating any provisions of the National Electric Code, and it could be moved to the road and still stay within the scope of good engineering practices. The cost of moving the line to a route along the road was estimated at $1,200 to $3,000.
As stated in our original opinion, no bad faith is being imputed to Mr. Hetherwick in any manner, but it is to be noted and pointed out that he and he alone dictated the route now being objected to. We did not hold in the original opinion, and we do not hold now, that the condemnor must negotiate with each landowner in the selection of a site; however, it must be shown that the convenience of the landowner was not completely ignored by the condemnor in the selection of the route; and, where the record indicates that an alternate route *561 is much more safe and convenient to the landowner without any unreasonable inconvenience to the condemnor, this court is of the opinion that such alternate route should be used.
This court will not select a route for the condemnor, or demand that another route be selected by the condemnor; however, the court will demand that the condemnor in such cases will pay heed to the provisions of LSA-R.S. 19:2 and take into consideration the convenience of the landowner. Further, that the record reflect in condemnation cases that the condemnor did not abuse the privilege given to it to expropriate, nor shall it act in bad faith arbitrarily or unreasonably in the expropriation of property. This court recognizes that where a condemnor acts within the scope and area of sound economic principles and proper engineering procedures, its selection of a route will not be disturbed. However, a condemnor cannot take advantage of the powers granted under our laws and at the same time arbitrarily ignore the requirement of LSA-R.S. 19:2(9) that the lines be located so as not to interfere "more than is necessary, with the convenience of the land-owner."
In our original opinion we ordered the judgment of the lower court reversed and the case remanded for the purpose of taking additional testimony and receiving further evidence on the restricted point pertaining to the relocation of the line across the lands of defendants, coupled with whatever evidence is desired to be introduced relating to the issue of severance damages in the light of relocation. This court is now of the opinion that its original judgment was correct, and the original opinion is hereby ordered reinstated.
HOOD, J., dissents, being of the opinion that the judgment of the district court is correct.