240 So.2d 707

**LOUISIANA POWER & LIGHT COMPANY**

v.

*George A. LASSEIGNE, Jr., et al.*

**LOUISIANA POWER & LIGHT COMPANY**

v.

Miss Yvonne BRADY et al.

**LOUISIANA POWER & LIGHT COMPANY**

v.

Peter J. BRADY et al.

Nos. 49847, 49851.

June 8, 1970.

Rehearing Denied June 29, 1970.

For Original Opinion see 241 So.2d 494.

Vial, Vial & Lemmon, Harry T. Lemmon, Hahnville, Monroe & Lemann, Andrew P. Carter, Eugene G. Taggart, Chas. King Mallory, New Orleans, for petitioners in No. 49851 and respondents in No. 49847.

Becnel & Kliebert, Thomas J. Kliebert, Gramercy, for petitioners in No. 49847 and respondents in No. 49851.

## ON REHEARING

SUMMERS, Justice.

Plaintiff Louisiana Power & Light Company is a Florida corporation created for the purpose, among others, of developing and transmitting electricity for power, lighting, heating, or other such uses. As such it is authorized to expropriate immovable property, including servitudes, needed for transmission lines. La.R.S. 19:1, 19:2(9). These suits were instituted

to acquire a servitude 100 feet wide across the property of defendants. The taking is resisted on the grounds that (1) the legislation authorizing the expropriation (La. R.S. 19:1 through 19:107) violates the Louisiana Constitution (La.Const. Art. I, Sec. 2) and the Fifth, Seventh and Fourteenth Amendments to the United States Constitution in that it fails to give sufficient notice or time to prepare a defense, and thus deprives defendants of their property without due process of law; (2) plaintiff made no lawful attempt to acquire the servitude by amicable means; (3) the taking is not in the public interest; and (4) defendants dispute the amounts offered for the taking.

The suits were consolidated and after trial the court granted servitudes for transmission lines across the lands of the defendants fixing the amounts due therefor by plaintiff. Plaintiff has proceeded with the removal of its line along the expropriated servitude and has filed abandonments of the original servitude. In devolutive appeals by defendants to the Fourth Circuit, the judgments granting the servitudes were affirmed, but the amounts awarded were increased.

Plaintiff applied for writs complaining that the awards were excessive; and defendants, reiterating the contentions first stated in the trial court, applied for review of the judgments allowing the taking, and, alternatively, they sought further increase in the awards. The writs were granted. Our original opinion denied plaintiff the right to expropriate on the theory that the public need had not been shown. Feeling that we erred, we granted a rehearing.

When these suits were instituted, plaintiff had a 115 kilowatt transmission line running in an east-west direction across the lands of defendants. The line originated from its Little Gypsy generation station on the left descending bank of the Mississippi River in St. Charles Parish and ran up the river to a point near Sorrento. There the line divides; one branch tends northerly to the Florida Parishes, while the other runs in a southerly direction toward the Mississippi River. As will be seen by the sketch appearing as an appendix to the original opinion, in the vicinity of defendants' property the transmission line runs parallel to and south of the Airline Highway, crossing the highway west of defendants' property, so that in the immediate area of the expropriation the existing transmission line lies north of the highway and the river.

The existing line was constructed in 1930. In 1961 it was substantially rebuilt along a line lying to the south, away from the highway and nearer the river. On defendants' property, however, a segment of the original line remains; and, in this suit, plaintiff seeks a new right of way south of the existing line and nearer the highway. Plaintiff proposed that the abandonment of

the old servitude should serve, at least in part, to compensate for the new one.

## I.

Contending that the expropriation statute does not give sufficient notice or time to prepare a defense, defendants say that, as applied in this case, it offends the constitutional guarantee of due process. The pertinent provisions of the statute under attack provide:

The defendant shall file his answer and serve a copy thereof on the plaintiff within ten days after the service upon the defendant of the notice of the time fixed for the trial. Every answer when filed shall have a certificate thereon showing the service thereof. (La.R.S. 19:6).

Failure of the defendant in any such suit to file his answer timely or to serve a copy thereof on the plaintiff timely constitutes a waiver by the defendant of all defenses to the suit except claims for money as compensation for the property sought to be expropriated and claims for money as damages to other property. (La.R.S. 19:7).

In these proceedings, filed on September 28, 1967, defendants consisted of residents of Louisiana, a resident of Texas, the spouse of a living and of a deceased person, and unknown absent heirs of two deceased persons whose successions have never been opened. All were cited to appear and file responsive pleadings within the time and as directed in the quoted provisions of the Revised Statutes. The case was fixed for trial on October 31, 1967. Defendants filed exceptions, answers and interrogatories on October 12, 1967, which were answered on October 30, 1967. At that time defendant filed a motion for a continuance, which was granted, continuing the suits to November 15 and 17, 1967. The trial lasted four days, November 15 and 17, 1967 and January 5 and 10, 1968. Judgments were rendered on February 12, 1968.

Under these facts and circumstances, because of the brief time allowed, the contention is made that discovery and the right to file exceptions to clarify pleadings has, in effect, been denied; and defendant was unable to present a proper defense. Although defendants make no contention that the statute is unconstitutional on its face, it is asserted that under the facts of the case the time allowed for filing exceptions, the answer and preparing for defense is so short that due process is denied.

⬛ We agree with the Court of Appeal. The time provisions of the statute may render that legislation unconstitutional in its application in some instances; but, in view of the continuances granted by the Court, the facts of this case do not support a finding that the requirements of due process are offended and the statute was unconstitutionally applied. Expropriation

is an extraordinary remedy to which the Legislature has seen fit to apply special procedural rules. Until we are satisfied that the facts of a particular case warrant a finding that the statute is unconstitutional in its application, we must obey the legislative mandate.

## II.

■ The second defense, as we consider them, is that the expropriation statute establishes a condition to expropriation which was not complied with; and, therefore, under the statute and the jurisprudence, the judgment should be reversed. Reliance is placed upon the language of Section 2 of Title 19 of the Revised Statutes which states that plaintiff may expropriate needed property, "Where a price cannot be agreed upon with the owner * * *." Also, these cases are said to stand for the principle that a condemner must conduct good faith, bona fide negotiations before resort may be had to expropriation: Calcasieu & Southern Ry. Co. v. Witte, 224 La. 1091, 71 So.2d 854 (1954); Southwest Louisiana Electric Membership Corp. v. Simon, 207 So.2d 546 (La.App. 1968).

■■ As we understand this issue, defendants take the position that plaintiff's offer to acquire the new servitude by a voluntary transaction did not include a fair "price" as contemplated in Section 2 of

Title 19 of the Revised Statutes because the offer required that plaintiff receive credit on the price for the value of the existing servitude it would abandon. "Price", as used in the statute, it is argued, is money and not benefits derived by adjoining property as a result of the expropriation such as the abandonment of a servitude. This contention is well-founded.

■■ Compensation for taking property by expropriation must be a "price" in money. U.S.Const. Amend. V; La.Const. art. 1 § 2; La.Civil Code arts. 497, 2633–2634. Special benefits resulting from the taking under the statute in question may be set off from the damages to the remaining land but not from the value of the land taken. The rule is well stated in 3 Nicholls, Eminent Domain § 8:6211(19):

The rule that benefits could be set off from the damages to the remaining land, but not from the value of land taken, was established in Louisiana by judicial decisions. Benefits were allowed to be set off without any requirement that they be special for many years, but it was finally determined that only special benefits could be lawfully set off.

It is established law of this state that benefits may be set off against damages under the damage clause of the constitution, i. e., where there is a damage without a taking.

See also Louisiana Power & Light Co. v. Lasseigne, 220 So.2d 475 (La.App.1969) and Louisiana Power & Light Company v. Lasseigne, 220 So.2d 462 (La.App.1969).

█ In spite of the fact that plaintiffs were not entitled to the credit they claimed for abandoning the existing servitude, there was a plausible argument to support their contention. This, coupled with the fact that their claim had been allowed in another suit by this same trial court, and the fact that the offers they made to defendants were based upon the appraisals and opinions of their expert land appraisers, removes their case from the bad faith we feel the law contemplates as a bar to the right to expropriate. Their offer to acquire the property, when rejected, was, therefore, sufficient to permit them to invoke expropriation.

### III.

█ Defendants assert this expropriation is not prompted by a public need but instead the relocation is undertaken as a convenience or accommodation to Gulf States Land & Industries, Inc., the owner of two large tracts across the line who will be benefited by the removal in two ways: the removal of the line will provide more unencumbered frontage on the highway and it will remove the line from a large tract they have developed as a subdivision. It is true that Gulf States will be benefited by the removal. Evidence is also in the record that 119 other landowners of the 137 affected in the whole project indicated an unwillingness to grant plaintiff additional servitudes in the existing location, but were willing to grant unrestricted 100 foot servitudes in the new location without cost to plaintiffs. This demonstrates the advantage to be derived by the great majority of the landowners affected by the removal project, and that, in a sense, a public purpose is served.

These same advantages, however, do not accrue to defendants by virtue of the removal. Defendants are situated at a turn in the line as the sketch appended to the original opinion illustrates, and they will suffer added disadvantages from the removal project, not benefits like the others. Uncontradicted testimony also establishes that engineering art requires the taking plaintiff seeks on defendants' properties in order to straighten out the line which would otherwise be unduly twisted at that location.

Unquestionably the area served by the existing line, and to be served by the newer, higher capacity line, has experienced a marked economic development. An unusual increase in home and industrial users has resulted. All projections point to a future growth of unprecedented proportions. It is this present and contemplated need which plaintiff is planning to fill by expanding its facilities. The demand for electricity had already reached the point

where the existing facilities were taxed to their limit and could not be made to accommodate future needs. We do not understand that defendants deny these facts. Indeed, they offered no evidence to refute this conclusion.

Nevertheless, defendants have belabored the fact that negotiations between Gulf States and plaintiff strongly indicate that the move was principally to accommodate Gulf States. Conceding the advantages accuring to Gulf States from the removal, as we have pointed out, we are not convinced that this factor was the prime motive behind the removal or that it minimizes the public need otherwise demonstrated. The many other landowners affected (119 out of 137) desired this removal; and they were agreeable to the removal without cost to plaintiff—lower costs to plaintiff means low electric costs to the public; the existing servitude was not wide enough over a substantial number of the tracts affected, being merely fifteen feet wide, to accommodate the structures planned for the new 230 kilowatt facility, and the new facility was to be constructed on steel towers over 100 feet high with concrete foundations 25 feet square making the existing fifteen foot servitudes clearly inadequate.

Our compassion for defendants' plight cannot bias our decision in the light of the clearly demonstrated public need which they have not refuted. It is inevitable that progress will sometimes require a surrender of private rights for the public good under existing law. Courts must be vigilant that the legal remedies resorted to are not abused. We find no abuse here.

IV.

Finally, the question of the awards is contested by both parties. Our review of the Court of Appeal determination of these issues reveals no manifest error, and we will not disturb its findings.

Accordingly, the judgment of the Court of Appeals is affirmed.

BARHAM, Justice (dissenting).

The principal issue before the court is discussed in the five paragraphs appearing in that portion of the majority opinion numbered "III", and that is the question of whether the taking of these properties has been established to be for a public purpose. I adhere to the reasons given in my original opinion, which concluded that the plaintiff has failed to establish public purpose.

The majority opinion does not come to grips with the problem presented. Plaintiff has constructed, in the middle of miles of 110–KV lines, a short span of 220–KV line on steel towers, a construction which has brought no new or improved service to anyone, for on either side maximum transmission is only 110 kilovolts and there is no source to provide 220 kilovolts of power to this segment. Futhermore, as pointed out in my original opinion, the

record fails to reflect any plans for *future* conversion of the remaining 110–KV line to 220 kilovolts. It is obvious, then, that this new segment affords no additional power or service, but is merely a business accommodation, by relocation of an existing line, for a large landholding corporation's financial benefit.

Therefore there was never, and there is not now, a public need or a public purpose served by the construction at issue. The majority's conclusion that the demand for electricity had reached the point where existing facilities were taxed to their limit is an erroneous finding of fact both as of the date of trial and even to this date. The plaintiff does in fact serve all the needs along the entire line in question with 110 kilovolts of power, and, I repeat, has presented no plan (except by way of legal argument after trial) for converting any of the lines to actually transmit 220 kilovolts although this small segment has that capacity if the plaintiff would provide the several miles of line necessary to so energize it. The majority's finding that "engineering art requires the taking plaintiff seeks on defendants' properties in order to straighten out the line" is contradicted by the very fact that the other extremity of this same short span of line on steel towers is in fact "unduly twisted" by *two* 90° turns. This, to me, is proof, in and of itself, that the existing line is not engineeringly inartistic, undesirable, unusual, unfeasible, or impractical.

The plaintiff has assumed so many different positions in order to gain judicial approval for its illegal, improper, and abusive use of eminent domain that it appears as multi-appendaged as an octopus. It has embraced and discarded so many arguments that my belief in any of them is destroyed. While I will be the first to protect the right to exercise eminent domain when it serves the public need and purpose, I find the taking in these cases to be an abuse and a perversion of that extraordinary grant of power for the taking of private property.

Rehearing denied.

BARHAM, J., is of the opinion that a rehearing should be granted.