BARHAM, Justice.
Plaintiff, a public utility with expropriating authority tinder R.S. 19:2(9), filed these expropriation suits, which were consolidated for trial, for appeal, and for argument before us, seeking to obtain a 100-foot servitude across these defendants’ lands and offering to abandon another 100-foot servitude across a different portion of their lands and to pay an additional amount for just compensation. The trial court granted the new servitude upon release and extinguishment by plaintiff of the existing servitude, reserved to defendants the right to claim damages which might be incurred by reason of the coexistence of the two' servitudes during relocation, made an award of certain amounts in two of the cases as just compensation “in lieu of the Court’s awarding severance damages”, and in the other suit allowed both just compensation and severance damage. The Court of Appeal granted severance damage and just compensation to defendants in all three suits and increased all awards. 220 So.2d 475. We "granted writs on the" application of both plaintiff and defendants.
The plaintiff attacks the Court of Appeal awards of severance damages. "Defendants urge that plaintiff' failed to prove the public purpose, need, and necessity required for expropriation, that its exercise of the power of~ expropriation was only to further a private agreement between plaintiff and, a large corporate landowner for their mutual advantage, and that such use constituted an abuse of that power. It is also argued by defendants that the proceedings originating in - an attempt to swap servitudes were a denial of due process. Finally, in the .alternative, they ■ argue that the awards made by the Court of "Appeal- were inadequate.
The Court of Appeal cusorily passed upon the first two contentions of these defendants, relying "upon its decision in Louisiana Power & Light -Company v. Lasseigne, 220 So.2d 462, which involved other properties and other parties at another location. However, since that record was made a- part of the suits involving these parties and is attached by reference, we "must consider the evidence in both for the" purpose of'this decision.
At the time Louisiana Power & Light Company, hereafter referred to as L. P. & L., filed this suit, it had a 100-foot right of way across the properties of the defendants upon which it maintained a 115-KV transmission line "suspended on wooden H-frames. The existing servitude rail’ straight from Sorrento to Lutcher, where it angled. From just east of-the Lutcher "substation it continued in’, a straight .line -to a *75 point approximately 250 feet from the western boundary of a parcel of land belonging to one of the defendants, where it again angled. It then resumed its straight course through these defendants’ lands and other properties for several more miles to Little Gypsy, a large generating plant. The servitude generally followed the Airline Highway (U.S. 61) except that it did not deviate for the curves in the highway. The 10- to 15-mile stretch of transmission line between the Lutcher substation and defendants’ properties deviated from its straight course only once, at the western boundary of LaPlace Plantation a few hundred yards’ distance from the subject properties. That deviation, according to plaintiff’s witnesses, was necessary because the relatively short wooden H-frames then in use would not suspend the line sufficiently in height over Airline Highway without zigzagging where the line crossed that highway.
To establish public necessity and purpose plaintiff relies principally upon its need to prepare for the anticipated future requirements for increased electrical power in this general area because of projected industrial, commercial, and residential growth. It allegedly envisioned an eventual conversion of the entire 115-KV line from Little Gypsy to Sorrento to a 230-KV line. It urges that to make this change-over for future needs and to straighten the line— that is, the zigzag — required for suspension of the line over Airline Highway, there was public need and purpose to be served in acquiring the new servitude.
L. P. & L. offered three witnesses, Mr. Morris Steiner, operating superintendent; Mr. George P. Marse, land agent, and Mr. E. A. Rodrigue, senior vice-president of the company, in its attempt to prove the public purpose of its proposed expropriation. From this testimony the following facts appear.[1] About 1956 plaintiff began to plan in a general way to construct a 230-KV line from the Little Gypsy plant to Sorrento, which would actually be a reconstruction of the existing 115-KV line between those same two points. Coincidentally in the same year Godchaux, Inc., became Gulf States Land & Industries, Inc., hereafter called Gulf States, and the assets of the former corporation, including Belle Point and LaPlace plantations, were transferred to Gulf States. Again by coincidence in the same year Gulf States granted an option to Dupont, Inc., for the purchase of a portion of the Belle Point Plantation. According to the testimony of Gulf States’ vice-president, Mr. Cain, this “was the trigger that set off the need for a master plan” for the two plantations. According *77 to Mr. Marse’s testimony and other evidence, L. P. & L. and Dupont had made arrangements originally in regard to power needs and changes of location of the power line across the Belle Point Plantation so that Dupont, if it exercised its option, could fully utilize the land and he given proper electrical service for a proposed industrial plant. Since Dupont was acting at that time under the option to purchase part of Belle Point from Gulf States, it was to the benefit and advantage of Gulf States as well as of L. P. & L. and Dupont that power be made available and lines relocated where needed by the proposed Dupont industry.
Mr. Cain testified that L. P. & L. “contacted us with regard to the right of way to be changed at Bell Point”. He went on to say that in conjunction with the relocation on Belle Point, Gulf States, which owned the large LaPlace Plantation, realized the advantage of developing this plantation into a residential and commercial area because of the expected influx of population which might be attracted by Dupont, and it instigated these further changes with L. P. & L. on LaPlace Plantation in order to benefit its own development of the property. Although the deed of acquisition is not in the record, Mr. Cain testified that when Gulf States was contacted in regard to relocating the servitude at Belle Point along the railroad, L. P. & L. also wanted a substation (transformer and distribution unit) site and a utility corridor leading up to the Airline Highway. He also testified that L. P. & L. informed him that these requirements were based upon needs and desires of Dupont for maximum utility of land and for power supply as expressed in conversations between L. P. & L. and Dupont.
In line with all of these circumstances, on June 19, 1958, L. P. & L. and Gulf States entered into a servitude deed. The instrument is divided into three grants. We include a map with letter designations for better understanding of the different locations referred to. The first grant, “R/W No. 1”, gave a 100-foot servitude adjacent to the Louisiana and Arkansas Railroad from the east boundary of La-Place Plantation to the west boundary of that plantation (A to B on the map). “R/W No. 2” granted a 100-foot servitude from the east boundary of Belle Point Plantation also along the railroad to the west boundary of that plantation (C to D), thence north and west along the west boundary of that plantation to the existing 115-KV transmission line (D to E), thence north and west further along that same west boundary to an intersection with Airline Highway to form an' 80-foot utility corridor (E to F). Under “R/W No. 3” a “temporary” 100-foot servitude was granted along the west line of LaPlace Plantation so as to connect the proposed new transmission line with the old trans-

*79

*81 mission line -along the west boundary of LaPlace Plantation (B to O).
It is apparent that L. P. & L.’s need to service one customer, Dupont, required a servitude for a transmission line from the old transmission line to its new Belle Point substation (E to D)j and in order not to interfere with or encumber Dupont’s use of this land, it intended to move its line across Belle Point to the railroad (C to D). In order to comply with Gulf States’ request for unencumbering LaPlace Plantation, it intended to also relocate that line adjacent to the railroad. L. P. & L. also hoped to acquire a servitude adjacent to the railroad across the intervening properties between Belle Point and LaPlace (B to C). In the event that the intervening properties could not be made the subject of acquisition or expropriation, L. P. & L. required a temporary servitude upon the west boundary of LaPlace Plantation (B to O) so that power could be brought from the old transmission line to the new transmission line. Appropriate releases of the old servitudes in exchange for the new servitudes depending upon construction "and the obtaining of rights of way were included in the grant.
By letter dated April 17, 1959, L. P. & L communicated to Gulf States the following :• “The terms of our. previous agreement provided that we would relocate our existing 115 KV transmission line crossing the La-. Place Plantation in order to assist you in developing the subdivision known as the Godchaux Community, which the line - would, encumber as it exists. We agreed to re-, locate this line at no cost to you, provided, that you would grant us a new 100-foot right-of-way in a suitable location on your, property and that you would obtain a 100-foot right-of-way from the property owners adjoining to the East of LaPlace Plantation. The right-of-way agreement between us dated June 19, 1958, was executed in accordance with this understanding.” (Emphasis here and elsewhere has been supplied.)
The letter further stated that inasmuch as Gulf States had been unable to obtain the servitudes on the adjoining property to the east in accordance with previous agreements, L. P. & L. proposed to construct a permanent steel tower line on the new right-of way adjacent to the L. & A. Railroad,, but it would erect only a temporary wood, pole line along the west boundary to tie-into the existing line. It also stated that L. P. & L. would need a servitude on the-east property line of LaPlace Plantation to-erect a temporary wood pole line to tie in with the old line (A to P). The latter con-: struction was to be at additional cost of $3700.00 and chargeable to Gulf States, and required the granting of a 100-foot permanent right of way on the- east boundary. L. P. & L. further proposed that Gulf,. States should continue to. pursue -the-.ac^ quisition of the servitudes to -the east as^ originally-proposed (A to %),, -and in the, *83 event they could not be acquired, then L. P. & L. would replace the proposed temporary wooden poles on the east line with permanent towers of the same nature as those along the railroad. This cost, estimated at $35,000.00, was to be paid by Gulf States if the rights of way were not forthcoming, and a bond of $35,000.00 was required from Gulf States to cover this cost.
Another letter from L. P. & L. to Gulf States dated February 18, 1964, extended the prior agreements. L. P. & L. noted its own difficulty in acquiring all of the servitudes between Belle Point and LaPlace (B to C), and granted to Gulf States two years, or until L. P. & L. could expropriate these servitudes to the west, for Gulf States to meet its obligation to acquire the servitudes to the east of LaPlace. It reinstated the bond and arranged for the installment payment for the cost of the permanent east boundary construction (A to P)- if -it became necessary because Gulf States was unable to acquire the servitudes to the east.
In a letter of March 11, 1966, L. P. & L. for'the first time indicated that it would usé its power of expropriation to attempt to acquire the property to the east of LaPlace Plantation (A to X), and it required Gulf States to retain in effect its $35,000.00 bond to cover in part the estimated $50,000.00 required for the acquisition of these rights of' way. Finally, however, because L. P. &"L. needed to construct a 500-KV electric transmission line from one of Gulf States Utilities Company’s generating stations in Iberville Parish to Little Gypsy over several sections of Gulf States’ properties, by letter dated November 4, 1966, it proposed that in consideration of the servitude from Gulf States for this line it would release Gulf States from all its obligation.
It is important to note that in the letter of April 17, 1959, L. P. & L. spoke of relocating “ * * * our existing 115 KV transmission line”; that again by letter of November 4, 1966, it specified the relocating of “ * * * its 115 KV line * * * We also note a most peculiar and unusual provision in the servitude agreement of special benefit to Gulf States: “Grantee agrees to relocate, at the expense of Grantor, any of Grantee’s facilities on said right of way promptly when requested so to do by Grantor upon being furnished with a new and mutually satisfactory location.”
The following excerpts from the letter of April 17, 1959, eloquently set forth the private purpose to be served by the private agreement between L. P. & L. and Gulf States: “The terms of our previous agreement provided we would relocate * * * in order to assist you in developing the subdivision * * “The right-of-way agreement * * * was executed in accordance with this understanding.” “ * * we will relocate * * * under the following conditions’: * *’ * (4) You will *85 continue to pursue the acquisition of rights of way * * * (5) In the event that the above * * * cannot be acquired, you agree to reimburse us for the additional costs involved in permanently locating our line on the North-South drainage servitude * * * ” (A to P)
The deed of June 19, 1958, and the subsequent letters clearly and emphatically state the purpose to be served by the deviation and relocation of the 115-KV line from the west boundary of Belle Point to the east boundary of LaPlace. Although the lack of public purpose can be determined from the voluble and explicit language of these instruments alone, there is much other supportive evidence.
Of approximately 30 miles of 115-KV line, to date only this specific segment has been relocated after almost 15 years of alleged planning and construction, and not one foot of the entire servitude carries the 230-KV line which plaintiff states was intended.[2] One of plaintiff’s witnesses testifled in the first suit, which was filed in 1962, that it was necessary for the 230-KV line to be in operation by 1965. However, almost 10 years elapsed after the relocation of the line for Gulf States’ convenience on LaPlace Plantation before plaintiff attempted to expropriate the servitude which is involved in these proceedings. Again, according to plaintiff’s own witnesses, there are no plans, designs, routes, or specifications either off or on the drawing boards for conversion of the remainder of this 115-KV line, and there can be no use made of this small segment of construction for 230-KV line until there is a change-over in the entire line from its generating source.
We cannot believe that plaintiff is sincere in assuming the position -that it would serve a public purpose to relocate the servitude in order to straighten the transmission line. Nothing could be further from the truth. As we have previously noted, the existing line was perfectly straight except for the deviation for crossing the highway.[3] *87 According to plaintiff’s plats of the proposed reconstruction on Belle Point Plantation two 89° angles were required, and the witness Steiner in the first suit admitted these “doglegs” on Belle Point, and his testimony was indicative of their permanence, tie further testified that there might be other “doglegs” permanently located on the remainder of the line when it was reconstructed.
We also reject the argument of plaintiff that the new servitude was required because the old servitude would not support the new construction. It is our conclusion from the evidence in the record that the old servitude was an ideal location for the reconstruction and conversion to a 230-KV line.[4] ' ' '
Supporting our conclusion that the old 'servitude could be used for the construction of the proposed 230-KV line and that a Slew location and grant of servitude are unnecessary is the very fact that plaintiff seeks to return to the old servitude at a location on property' of one of these defendánts. Plaintiff proposes to leave the route along the railroad, which was so desirable for crossing Belle Point and LaPlace plantations, and seeks to make a permanent construction across defendants’ lands in a new location, not adjacent to the railroad, in order to return to the old servitude route. If the line from that point to Little Gypsy is ever reconstructed to carry a 230-KV line, it will be constructed on the old servi-' tude. It is apparent, then, that it is a fallacious argument that the old servitude could not support or was not engineeringly desirable for a 230-KV line.
If a public advantage or purpose is served, it is not a derogation of this public purpose that the condemnor profits or even that one or more landowners receive special benefits from the construction on and use of expropriated property. But the public must be advantaged, must be benefited before any private property can be expropriated. If a public utility and one *89 landowner for mutual benefit contract so that the public utility makes concessions and grants special benefits to that landowner, this would be a matter of private contract and not prohibited if it does not inconvenience and damage other property owners, disadvantage the public, or require the taking of private property. However, this is not the situation before us.
Article 1, Section 2, of the Louisiana Constitution provides in part: “ * * * private property shall not be taken or damaged except for public purposes * * And Article 4, Section 15, states in part: “ * * * nor shall vested rights be divested, unless for purposes of public utility * *
The right of eminent domain is an exception and reservation imposed upon the free exercise of private ownership of property, and often produces harsh consequences. There is no absolute right — to the contrary, only a very limited right — for the power of eminent domain and the expropriation of private property. The State or other authorities who derive their power ■from the State must show public purpose for use of this exceptional grant, which is in reality a constitutional limitation upon the power of the State. Our Constitution specifically recognizes that only the public benefit, advantage, and utility can substantiate a forced deprivation of private property under this power.
The right of ■ expropriation cannot be', used irresponsibly, capriciously, arbitrarily, despotically, or deviously by a condemnor. No public, purpose was served by the relocation of the servitude across the properties of Gulf States and the intervening lands. This does not mean that there may be no public purpose in converting an entire 115-KV transmission line to a 230-KV line, but we do conclude that the new location for Louisiana Power and Light’s power line in this area has not been shown to serve a public purpose. Even if we assume for the sake of argument that plaintiff has proved that the conversion of the voltage capacity from Little Gypsy to Sorrento would serve a public purpose, this would not be sufficient. It would still be necessary for the plaintiff to establish that the taking of the defendants’ lands for that use is necessary to accomplish the public purpose. . Louisiana Power & Light’s voluntary deviation- from a serviceable, engineeringly desirable servitude for its and Gulf States’ benefit on Gulf States’ properties cannot now justify the taking of private land to 'the east of that location. It is the public which must be served,, and Louisiana Power & Light failed to- take this into consideration when- it,began the negotiations which have resulted in its present unfavorable' and unfortunate position. ■We find the'attempt by plaintiff to exercise the right of expropriation upon these defendants’ properties -is 'not for a public *91 purpose and is an abuse and misuse of the power of expropriation.
The judgments of both courts are reversed, and plaintiff’s suits are dismissed at its costs.
SANDERS, J., dissents.

. As previously noted, it is necessary for us to read two records for the purpose of this opinion. Mr. Marse and Mr. Steiner testified in both suits, and we will summarize their testimony in both. Mr. Rodrigue testified only in the present proceedings.

. Plaintiff makes muck of the fact that in the vicinity of the Gramerey-Lutcher area approximately 15 miles west of the subject property, it has constructed a new 230-KV line in order to service a Texaco refinery, and that it intends to construct a substation in the vicinity of Convent, which is near that same area, in order to service another industry. However, that 230-KV line is a new construction and does not replace the approximately 12-mile stretch of the existing 115-KV line which runs to Sorrento north and west of the Lutcher-Gramercy area and which is a part of the entire 115-KV line running from Sorrento to the Little Gypsy plant. Plaintiff also argues that the moving of a heavy construction crew into the LaPlace area was in anticipation of converting the entire 115-KV line to a 230-KV line. The evidence is to the contrary, indicating that the crew was used for making service connections to customers in the area.

. With the new towers over 100 feet tall, spaced hundreds of feet apart, and ca- ' pable of suspending long and heavy lines at great heights, this deviation should be *87 corrected. Certainly even if additional towers were required in order to properly suspend the transmission line over the highway, the acquisition of new servitudes over many miles is far more expensive to plaintiff and onerous to landowners than is the construction of one or two additional towers.

. While plaintiff’s witnesses opine that the old servitude grants for'the 115-KV line were, insufficient for the erection of the new 230-KV line, there' is no factual \ information, íh thé, particular record involving. these defendants to support such ' a conclusion'. "'In testimony in the old record one of the witnesses reasoned that some of the old servitudes required location of poles in ditches, and that the new line could not be located on those servitudes because the now construction could not be made in ditch banks. He alluded generally to other restrictions in some of the old servitude grants which would interfere with this now type of construction. We conclude that not only was the old servitude available with minor changes for the new transmission line, but it Was the straightest route and less onerous to the landowners as a whole for the entire length of the line of the proposed reconstruction.